## UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF TEXAS
## MIDLAND DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| Remnant Oil Company, LLC and | § | Case No. 19-70106 |
| Remnant Oil Operating, LLC, | § | Case No. 19-70107 |
| | § | |
| Debtors. | § | Chapter 11 |
| | § | |
| | § | (Joint Administration Requested) |
| | § | |

## DECLARATION OF E. WILLARD GRAY II IN SUPPORT
## OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

I, E. Willard Gray II, declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury as follows:

1.      I am the Chief Executive Officer of Remnant Oil Company, LLC ("**Remnant Company**") and the Manager of Remnant Oil Operating, LLC ("**Remnant Operating**" and together with Remnant Company, the "**Debtors**" or "**Remnant**").   On July 8, 2019 (the "**Petition Date**"), each of the above-captioned Debtors filed for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").

2.      I make this Declaration in support of certain initial motions (collectively, the "**First Day Motions**") filed in these cases (the "**Chapter 11 Cases**"), which have been or are to be soon filed, including the following:

(a) Debtors' Emergency Motion for Entry of an Order Directing Joint Administration of Chapter 11 Cases   (filed in each case) ("**Joint Administration Motion**");

(b) Debtors' Emergency Motion for Entry of an Order (i) Authorizing the Debtors to File a Consolidated List of Creditors and a Consolidated List of the 30 Largest Unsecured Creditors, (ii) Authorizing the Debtors to Redact Certain Personal Identification Information for Individual Creditors, and (iii) Approving the Form and Manner of Notifying Creditors of the

Commencement of the Chapter 11 Cases and Other Information (the "**Creditor List Motion**");

(c) Debtors' Emergency Motion to Extend Time to File Schedules and Statements ("**Extension Motion**");

(d) Debtors' Emergency Motion for Order (i) Authorizing Continued Use of Existing Business Forms and Records; (ii) Authorizing Maintenance of Existing Bank Accounts; and (iii) Waiving Certain U.S. Trustee Requirements ("**Cash Management Motion**");

(e) Debtors' Emergency Motion for an Order (i) Prohibiting Utility Companies From Altering or Discontinuing Service on Account of Prepetition Invoices, (ii) Approving Deposit Account as Adequate Assurance of Payment, and (iii) Establishing Procedures for Resolving Requests by Utility Companies for Additional Adequate Assurance of Payment ("**Utilities Motion**"); and

(f) Motion of Debtors for Entry of Interim and Final Orders Authorizing Payment of (i) Certain Prepetition Workforce Claims, Including Wages, Salaries, and Other Compensation, (ii) Certain Benefits and Confirming Right to Continue Benefits on Postpetition Basis, (iii) Reimbursement to Staff Members for Prepetition Expenses, (iv) Withholding and Payroll Related Taxes (v) Worker's Compensation Obligations, and (vi) Prepetition Claims Owing to Administrators and Third Party Providers ("**Workforce Motion**").

The Debtors may reference this declaration from time to time in support of other motions and applications in these Chapter 11 Cases as well.

## I.  THE DEBTORS' STRUCTURE AND BUSINESS AND THE REASONS FOR FILING CHAPTER 11

### A.  <u>Debtors' Business and Properties</u>

3.  Remnant is an oil and gas exploitation and production company headquartered in Midland, Texas.  Remnant is geographically focused in the Permian Basin of Southeastern New Mexico and West Texas, the most prolific oil and gas production region in the U.S., and specifically on the Northwest Shelf area of the Delaware Basin and the Artesia Platform in Eddy, Lea, and Chaves counties of New Mexico.  Geologically, Remnant primarily targets the shallow Permian-age Guadalupian reservoirs along the Northwest Shelf, principally the Yates, Seven

17952852.1
233559-10001

Rivers, Queen, Grayburg, and San Andres zones with well depths ranging between approximately 1,800' to 4,000'.

4.      Remnant operates 480 wells within a leasehold portfolio of approximately 47,960 gross acres in Eddy, Lea, and Chaves counties, New Mexico. This portfolio is divided into two groups: (1) Caprock Properties, and (2) Non-Caprock Properties.

5.      Remnant's Caprock Properties cover approximately 13,980 gross acres and contain 174 wells, consisting primarily of the 96-well Rock Queen Unit, the 49-well Drickey Queen Sand Unit, and 29 other wells in the West Caprock Queen Unit, the North Caprock Celero Unit, and other miscellaneous Caprock-areas. All of the Caprock Properties are in Chaves and Lea Counties of New Mexico.

6.      Remnant's Non-Caprock Properties cover approximately 33,980 gross acres and contain 306 oil, gas, and injection wells in Eddy, Lea, and Chaves Counties in New Mexico on the Northwest Shelf of the Delaware Basin. Within the Non-Caprock Properties are six core areas. Five of the core areas are oil-producing and one core area is gas-producing. The six core areas represent 85% of the total wells (261 of 306 wells) in the Non-Caprock Properties. The remaining 45 wells in the Non-Caprock Properties are scattered wells, many of which will be evaluated for potential divestiture at a future date.

7.      In addition, Remnant owns wind rights valued at $4,000,000 and water rights valued at $3,000,000. Remnant Company, executed a wind lease with EDF Renewables Development, Inc. ("**EDF**") on December 11, 2018 for approximately 960 acres. A separate wind lease was executed with EDF that same date for an additional approximately 3,190 acres. Both leases are subject to minimum royalty payments over 30+ years, which equates to a Net Present Value of approximately $4,000,000.

17952852.1
233559-10001

8.      Finally, Remnant Company owns the ability to produce 16,000 bbls daily of fresh water, via two water licenses, L-3776 and L-2661, as further described by the New Mexico Office of the State Engineer.  A third party hydrologist assumed 40+ years of water saturation. Based on current market rates of fresh water within Southeast New Mexico, Remnant's internal valuation of the water licenses is approximately $3,000,000.

B.      **Debtors' History and Events Leading to Chapter 11 Cases**

9.      Remnant was formed in 2016.  At its peak, Remnant's senior secured debt totaled $5,000,00 and was held by three separate lenders:  (1) First Capital Bank of Texas, (2) 3-2-1 Ventures, and (3) Dr. Michael Ramsey.  Since then, Remnant has been able to reduce its senior secured debt by approximately $1,560,000 to a current balance of approximately $3,750,000.00. Like most start-ups, Remnant experienced one-time general and administrative costs of approximately $1,146,779.  Remnant also experienced non-recurring costs in 2017 and 2018 totaling approximately $4,275,000.  These non-recurring costs were anticipated since Remnant had acquired neglected, marginal waterflood properties.  Remnant's members have provided the company with funds in excess of $8,000,000 to fund these expenses and to cover cash flow deficiencies.  However, due to unforeseen circumstances, this amount was insufficient.

10.      Remnant acquired the Caprock Properties from Legacy Reserves LP ("**Legacy**") in May 2017.  Low oil prices at the time made continuing enhanced oil recovery by $CO_2$ flooding in the Rock Queen Unit uneconomical.  Remnant's plan for the Rock Queen Unit was to inject only $CO_2$ gas recycled from production and to increase water injection volumes to maintain reservoir pressure using its own 16,000 bbls of fresh water.  However, two months after Remnant acquired the Caprock Properties, the New Mexico State Land Office restricted all use of fresh

17952852.1
233559-10001

water for oil and gas purposes. As Remnant was unable to use the fresh water in its operations, there was a loss in reservoir pressure and a reduction in production.

11.     Separately, on or around October 5, 2017, Remnant entered into a fixed swap with Cargill for 500 bbls per day for 24 months at a fixed price of $50.46. However, because prices settled above the fixed price, Remnant has paid Cargill in excess of $600,000 since entering into the swap. Since production had dropped significantly, this payment reduced cash flow for the properties. Accordingly, Remnant lost revenue on top of the monthly cash payments due to Cargill. Remnant was able to unwind all associated hedges with Cargill over 2018 via three separate transactions in order to conserve cash, but these three transactions resulted in a liability to Cargill in the amount of approximately $3,700,000.

12.     With the reduction of cash flow, Remnant was unable to re-invest capital to maintain current production. Production fell due to normal operational issues with marginal wells. Production at its peak in October 2017 was 450 net bopd and 1.6 mmcfpd. In contrast, current production is 150 bopd and .97 mmcfpd.

13.     On top of the Debtors' already reduced production, the Permian Basin experienced a large differential on WTI, thus further reducing monthly cash flow. At its peak, the differential was in excess of $14.00. The oil differential has now normalized but natural gas differentials still remain depressed. Any gas revenue that was once realized by Remnant is now slightly negative. Remnant has taken measures to reduce costs associated with its gas wells by releasing all leased compression as well as only producing gas at a minimal rate to hold each lease.

14.     In 2019, Remnant experienced additional cash constraints when its bank, First Capital Bank of Texas, demanded amortization on the senior secured debt totaling

17952852.1
233559-10001

$2,850,000.00. This resulted in required monthly payments in the amount of approximately $69,000.00.

15.     Finally, Remnant has been able to reduce approximately $695,000 of vendor debt, by entering into various settlement agreements. Remnant now owes monthly settlement charges of approximately $26,000 over the next 14 months. Although this has positively impacted Remnant's balance sheet, it has greatly reduced its cash availability. In addition, Remnant has been unable to satisfy one main vendor, Kodiak Gas Services, which has filed Judgement against the company in the approximate amount of $3,300,000.

16.     Cash flow constraints have forced Remnant to leave wells shut-in when they went off line and to perform only a limited number of repair job workovers on both producer and injector wells. While a pilot project of well clean-out workovers with chemical treatments to remove paraffin and asphaltene damage in well completions showed promise and success in restoring well productive capability, capital was not available to continue this program or any other programs.

### C.     The Debtors' Intentions in Chapter 11

17.     Remnant owns valuable assets but lacks necessary working capital to unlock their potential. For example, Remnant's Caprock Properties have millions of barrels of recoverable oil remaining, and Remnant has comprehensive plans in place to restore and increase production from the Rock Queen Unit and the Drickey Sand Queen Unit. Through these Chapter 11 Cases, Remnant hopes to obtain financing to complete necessary initial workovers that would result in increased oil production and revenues from the Rock Queen Unit and the Drickey Sand Queen Unit. Remnant's Non-Caprock Properties also have significant potential. To unlock the value of the Non-Caprock Properties, Remnant intends to redevelop underdeveloped or underutilized

17952852.1
233559-10001

waterflood projects and also to develop new waterflood projects. These steps would increase oil production rates and lead to the ultimate recovery of oil reserves that are currently unrecoverable by primary production. But, again, Remnant needs some breathing room and the funds to enable it to execute on its comprehensive business plan.

18.     In addition to its 480 producing wells, Remnant has 142 wells that are offline and not capable of producing economically at today's oil prices. With a breathing spell and the ability to raise capital in these Chapter 11 Cases, Remnant is confident that it will be able to return the vast majority of these well to producing and providing the company positive cash flow.

## II.     FIRST DAY PLEADINGS

19.     Contemporaneously with the filing of their chapter 11 petitions, the Debtors seek approval of the First Day Motions and related orders (the "**Proposed Orders**"). The Debtors respectfully request that the Court enter each of the Proposed Orders as they are critical to the Debtors' successful reorganization in these Chapter 11 Cases.

20.     I have reviewed each of the First Day Motions, Proposed Orders, and exhibits thereto (or have otherwise had their contents explained to me), and the facts set forth therein are true and correct to the best of my knowledge, information, and belief. Moreover, I believe that the relief sought in each of the First Day Motions (a) is vital to enabling the Debtors to make the transition to, and operate in, chapter 11 with minimum interruptions and disruptions to their business or loss of productivity or value; and (b) constitutes a critical element in the Debtors' ability to successfully maximize value for the benefit of their estates.

### A.     Joint Administration Motion

21.     The Debtors' intended restructuring in these cases will involve claims and/or interests asserted against both Debtors.  Further, the management of all of the Debtors consists of the same individuals.  In light of these and other factors, I anticipate that each of the Debtors will seek similar or closely-related relief from this Court during the Chapter 11 Cases.  I also believe that most parties-in-interest will desire to receive information about the companies generally during these Chapter 11 Cases, rather than just the information concerning one of the Debtors.

22.     I am informed that joint administration of the Debtors' cases will greatly facilitate the filing of pleadings in these cases, helping the Debtors and other parties-in-interest to avoid unnecessary effort in filing duplicate (or nearly duplicate) pleadings in each case separately. Instead, I understand that joint administration will permit a filing in just one of the cases to address issues in each of the Chapter 11 Cases.  Such a procedure would not only be more efficient, but will assist the Court and all parties-in-interest in achieving and maintaining a "global" view of matters involving the companies.  Especially because I understand that joint administration does not affect the substantive rights of the Debtors, their estates or any other parties-in-interest, I can see only benefits – and likely great savings of judicial resources and Debtor and stakeholder time and money – realized from this relief.

**B.      Creditor List Motion**

23.     As set forth in the Creditor List Motion, the Debtors seek entry of an order: (a) authorizing the Debtors to file a consolidated creditor matrix and list of the 30 largest general unsecured creditors in lieu of submitting separate mailing matrices and creditor lists for each Debtor, (b) authorizing the Debtors to redact certain personal identification information for individual creditors, and (c) approving the form and manner of notice of commencement of these

Chapter 11 Cases and the scheduling of the meeting of creditors under section 341 of the Bankruptcy Code.

24.     Although I understand the list of creditors is usually filed on a debtor-by-debtor basis, here, the preparation of separate lists of creditors for each Debtor would be expensive, time consuming, administratively burdensome, and of little incremental benefit.    Further, because a large number of creditors may be shared between the Debtors, the Debtors request authority to file a single, consolidated list of their 30 largest general unsecured creditors (the "**Top 30 List**").   The Top 30 List will help alleviate administrative burdens, costs, and the possibility of duplicative service.   Finally, the Debtors respectfully submit that cause exists to authorize the Debtors to redact address information of individual creditors—several of whom are the Debtors' employees—from the Creditor Matrix because such information could be used to perpetrate identity theft.

25.     Additionally, through the Debtors' proposed noticing and balloting agent, the Debtors propose to serve the Notice of Commencement, on all parties entitled to notice of commencement of the Chapter 11 Cases to advise them of the meeting of creditors under section 341 of the Bankruptcy Code and of the bar date for filing proofs of claims.   Service of the single Notice of Commencement will not only avoid confusion among creditors, but will prevent the Debtors' estates from incurring unnecessary costs associated with serving multiple notices to the parties listed on the Debtors' voluminous creditor matrix.

### C.     <u>Extension Motion</u>

26.     By the Extension Motion, Debtors seek entry of an order extending the deadline by which the Debtors must file their schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, and statements

of financial affairs (collectively, the "**Schedules and Statements**") by 14 days, for a total of 28 days from the Petition Date, without prejudice to the Debtors' ability to request additional extensions for cause shown.

27.     The time leading up to the filing of the Chapter 11 Cases has been stressful for the Debtors' management and the operation of the business.  While I understand that providing complete information on the Debtors, as required by bankruptcy law and rules, is important, and the Debtors' management desires to provide such information, I am also certain that stabilizing the Debtors' business in the immediate post-filing period will help preserve and maximize value of these estates.

28.     For these reasons, I believe that the Court should grant the Debtors' Extension Motion.  With extra time to prepare the Schedules and Statements, the Debtors' management will not only have the best ability to assure the greatest possible accuracy and completeness of the information that is provided, but we will also have the additional "breathing room" to address any challenges to operations that the bankruptcy filings trigger.  Thus, additional time will help us to preserve value in the Debtors.

29.     Granting the Extension Motion will not, however, prejudice any creditors or other parties-in-interest.  I understand that the additional time that the Debtors are requesting to file Schedules and Statements is typical of such requests, as often granted by this Court.  In addition, I can assure the Court that the Debtors are prepared to respond to any appropriate information requests that the Debtors may receive from any parties-in-interest in the meantime, should there be urgency to receive such information before it would become available in the Debtors' Schedules and Statements.

17952852.1
233559-10001

### D. Cash Management Motion

30.     By the Cash Management Motion, the Debtors seek entry of an order (i) authorizing the Debtors to utilize their cash management system to the extent described in the Motion, (ii) authorizing the Debtors to maintain the Bank Accounts (defined below) for a period of three weeks following the Petition Date; (iii) authorizing the Debtors to continue using their existing business forms and records; and (iv) granting the Debtors a waiver of certain bank account and related requirements of (a) the Office of the United States Trustee for the Western District of Texas (the "**U.S. Trustee**") set forth in the *Region 7 Guidelines for Debtors-in-Possession* (the "**Guidelines**"), and (b) section 345(b) of the Bankruptcy Code to the extent that such requirements are inconsistent with any action taken by the Debtors in accordance with any order granting the Cash Management Motion or any other order entered in the Chapter 11 Cases.

31.     In the ordinary course of their business, the Debtors utilize a cash management system (the "**Cash Management System**"), which allows the Debtors to collect, transfer, and disburse funds generated from their operations and to facilitate cash monitoring and reporting. The Debtors currently maintain four (4) bank accounts (collectively, the "**Bank Accounts**") within the Cash Management System as follows:

| Account Holder | Bank | Account Number |
|---|---|---|
| Remnant Oil Operating, LLC | First Capital Bank of Texas | XXX220 |
| Remnant Oil Company, LLC | First Capital Bank of Texas | XXX063 |
| Remnant Oil Operating, LLC | West Texas National Bank | XXXX875 |
| Remnant Oil Company, LLC | West Texas National Bank | XXXX871 |

11

32.     The accounts at First Capital Bank of Texas ("**First Capital**") were utilized from the Debtors' inception until June 2019.  However, as the Debtors began to make preparations for transitioning into Chapter 11 and were unable to remain current on the secured indebtedness owed to First Capital, they made the decision to open new accounts at West Texas National Bank ("**West Texas**" and together with First Capital, the "**Debtors' Banks**") that would replicate the Cash Management System in place at First Capital.

33.     Remnant Operating's account at West Texas is used to pay most of the Debtors' operating expenses, including payroll, utilities and expenses relating to the Debtors' operations. Remnant Company's account at West Texas is used to make debt service payments, pay professional fees, and make other similar payments.  The Debtors' finance department transfers funds between the accounts upon the request of management.  The amounts that are transferred between the accounts vary depending on the Debtors' operations.

34.     The Debtors intend to open new bank accounts at a U.S. Trustee approved depository (the "**New Accounts**") that will replicate their Cash Management System to the extent described herein.  However, the Debtors request permission to continue to use the Bank Accounts for a period of three weeks from the Petition Date to ensure a smooth transition of their Cash Management System with minimal disruption.

35.     As part of the Cash Management System, the Debtors utilize numerous preprinted business forms (the "**Business Forms**") in the ordinary course of their business. The Debtors also maintain books and records to document, among other things, their profits and expenses.  To minimize expenses to their estates and avoid confusion on the part of customers, vendors, and suppliers during the pendency of these Chapter 11 Cases, the Debtors request that the Court authorize their continued use of all correspondence and Business Forms (including, without

limitation, letterhead, purchase orders, and invoices) as such forms were in existence immediately before the Petition Date, without reference to the Debtors' status as debtors in possession, rather than requiring the Debtors to incur the expense and delay of ordering entirely new Business Forms as required under the U.S. Trustee Guidelines. Once the current business forms are exhausted, any new Business Forms ordered by the Debtors will include the "Debtor-in-Possession" designation and the case number.

### E. Utilities Motion

36. I understand that bankruptcy law provides utilities with certain protections during a chapter 11 case which are in addition to those rights of other creditors and service providers. A failure to establish the parameters of these protections early in a bankruptcy case, I am told, can jeopardize the debtor's access to utility service.

37. The Debtors purchase electricity, telephone, internet, and related services from vendors that I am told could be considered utilities for bankruptcy purposes. It would be very problematic for the continued operation of the Debtors' business if any of these services were cut off. For this reason, the Utilities Motion requests the Court to fix the terms of any protection afforded to the utility providers of the Debtors during the Chapter 11 Cases. The intention of the Utilities Motion is to fulfill the Debtors' legal obligations to these utility providers while at the same time avoiding any unpredicted, abrupt interruptions of their services which could severely damage the Debtors' business. The Debtors incur approximately $65,600.00 in costs to utility providers per month and are proposing allocating $32,800.00 into a designated account for the adequate protection of the utility providers during the pendency of Chapter 11 Cases

38. I believe it critical that the Debtors know from the very beginning of these cases the terms they must fulfill in order to assure that their telephone, internet, online and related

services continue uninterrupted. I have read the Utilities Motion and confirm that the facts set forth therein are true and accurate.

**F.      Workforce Motion**

39.      By the Workforce Motion, the Debtors seek entry of an order authorizing, but not directing, the Debtors to (i) pay accrued prepetition wages, salaries, and other compensation to their Staff Members (as defined below); (ii) honor any prepetition obligations in respect of, and continue in the ordinary course of business until further notice (but not assume), Staff Member benefits plans and programs, as described below; (iii) reimburse Staff Members (as defined below) for prepetition expenses that Staff Members incurred on behalf of the Debtors in the ordinary course of business on a prepetition basis, provided such reimbursement is below the statutory priority amount; (iv) pay all related prepetition payroll taxes and other deductions; (v) honor worker's compensation obligations and related obligations, if any; and (vi) pay any prepetition claims of administrators and providers in the ordinary course of business to the extent that any of the foregoing programs are administered, insured, or paid through a third-party administrator or provider.

**i.      The Debtors' Staff**

40.      In connection with the operation of their business, the Debtors currently have eight full-time employees (collectively, the "**Employees**"). None of the Employees are represented by a union or a collective bargaining unit. Two of the Debtors' managing members also receive compensation from the Debtors (the "**Managers**") via Form 1099. Finally, the Debtors have three full time contractors (the "**Independent Contractors**"). The Independent Contractors conduct a range of important services for the Debtors, including for landwork, engineering, and pumping services. The Employees, Managers, and Independent Contractors (the "**Staff Members**") work primarily from the Debtors' Midland, Texas office.

17952852.1
233559-10001

41.     The Staff Members perform a wide variety of functions critical to the administration of these Chapter 11 Cases and the Debtors' restructuring. Their skills, knowledge, and understanding of the Debtors' operations and infrastructure are essential to preserving operational stability and efficiency. In many instances, the Staff Members include highly trained personnel who are not easily replaced. Without the continued, uninterrupted services of their Staff Members, the Debtors' restructuring efforts will be halted. If the Debtors cannot assure their Staff Members that they will promptly pay prepetition Staff Obligations (as defined below) to the extent allowed under the Bankruptcy Code, and continue to honor, as applicable, the Staff Benefits Obligations (as defined below), certain Staff Members will likely seek employment elsewhere.  The loss of Staff Members at this critical juncture would have a material adverse impact on the Debtors' business and ability to maximize value through these Chapter 11 Cases.

42.     Moreover, most of the Debtors' Staff Members rely exclusively on their compensation and benefits to pay their daily living expenses and support their families.  Thus, Staff Members will be exposed to significant financial hardships if the Debtors are not permitted to continue paying, as applicable, their compensation, providing benefits, and maintaining existing programs.  Consequently, the relief requested is necessary and appropriate.

### ii.     Employee Compensation

43.     In the ordinary course of business, the Debtors incur payroll and other compensation obligations for their Employees.  These obligations are described in more detail below.

### a.     Employee Compensation Obligations

44.     In the ordinary course of business, the Debtors incur payroll obligations to their Employees.  Each of the Employees is paid a fixed salary.

45.     The Debtors pay their Employees on a semi-monthly basis, on the 5th and 19th of the month.  Payroll is funded the same day it is disbursed.  The Debtors average payroll obligation per cycle is approximately $30,425.  The last payroll date before the Petition Date was July 5, 2019, which covered the payroll period from June 20, 2019 through July 4, 2019.  The Debtors estimate that as of the Petition Date, approximately $22,312 has accrued and remains unpaid (the "**Employee Compensation Obligations**"), representing the prorated portion of the Employee compensation due for the period from July 5, 2019 through the Petition Date.  To the best of the Debtors' understanding, none of the Employees are owed more than $13,650 in accrued and unpaid general prepetition wages or salaries.[1]  The Debtors seek authorization, but not direction, to pay any unpaid Employee Compensation Obligations.  In addition, the Debtors seek authority to cause any prepetition checks or electronic payment requests that were given in payment of Employee Compensation Obligations to be honored and to reissue any check or electronic payment request that is not cleared by the applicable bank or other financial institution, to the extent necessary.

### b.     Administrative Fee Obligations

46.     The Debtors use a third-party processor, Paychex, to process their payroll.  The ongoing services of Paychex is imperative to the smooth functioning of the Debtors' payroll system.  While the Debtors do not believe that any outstanding obligations are owed to Paychex as of the Petition Date, the Debtors seek authorization, but not direction, to pay any such fees to the extent it is determined that a balance is owed (the "**Administrative Fee Obligations**") and to continue paying the Administrative Fee Obligations postpetition in the ordinary course of business.  In addition, the Debtors seek authority to cause any prepetition checks or electronic

---

[1] To the extent that any Employee is owed more than $13,650 and the Debtors seek to pay such greater amount, the Debtors will seek authority to pay such amounts by separate motion pursuant to Bankruptcy Code section 502.

17952852.1
233559-10001

payment requests that were given in payment of Administrative Fee Obligations to be honored and to reissue any check or electronic payment request that is not cleared by the applicable bank or other financial institution, to the extent necessary.

### c.    Withholding Obligations

47.    For each applicable pay period, the Debtors may need to deduct certain amounts directly from Employees' paychecks, including, without limitation, pre- and after-tax deductions payable pursuant to policies and arrangements with certain Employees as well as legally-ordered deductions, and other miscellaneous deductions (collectively, the "**Deductions**").

48.    In connection with the salaries and wages paid to Employees, the Debtors are required by law to withhold amounts related to federal, state, and local income taxes, as well as social security, unemployment and Medicare taxes from Employees' wages (collectively, the "**Employee Withholding Taxes**") and to remit the same to the applicable taxing authorities.  In addition, the Debtors are required to make matching payments from their own funds for, among other things, social security and Medicare taxes and to pay, based on a percentage of gross payroll, state, and federal unemployment insurance, employment training taxes, and state disability insurance contributions (the "**Employer Payroll Tax Obligations**," and together with Employee Withholding Taxes, the "**Payroll Tax Obligations**").  Each pay cycle, the Debtors withhold any applicable Employee Withholding Taxes from the Employees' wages, and remit, in conjunction with Paychex and P2 Energy Solutions,[2] the same to the applicable taxing authorities.

49.    The Debtors seek authorization, but not direction, to continue to make the Deductions and satisfy the Payroll Tax Obligations (collectively, the "**Withholding**

---

[2]    P2 Energy Solutions provides a number of services to the Debtors, including state and federal tax determination and distribution of 1099s.  The Debtors' request for authority to pay P2 Energy Solutions will be the subject of a separate motion.

17952852.1
233559-10001

**Obligations**") and to remit amounts withheld on behalf of third parties postpetition in the ordinary course of business.

### iii. Independent Contractor and Manager Compensation

50.     The Debtors typically remit payment for the Independent Contractors' and Manager's services through their accounts payable system. On average, the Debtors pay approximately $52,140 per month on account of compensation owed to the Independent Contractors and Managers. As of the Petition Date, the Debtors estimate that approximately $38,820 is accrued and outstanding on account of the Independent Contractors and Managers (the "**Contractor and Manager Compensation Obligations**" and together with the Employee Compensation Obligations, Withholding Obligations, and Administrative Fee Obligations, the "**Staff Obligations**").   The Debtors seek authorization, but not direction, to pay any unpaid Contractor and Manager Compensation Obligations.   In addition, the Debtors seek authority to cause any prepetition checks or electronic payment requests that were given in payment of Contractor and Manager Compensation Obligations to be honored and to reissue any check or electronic payment request that is not cleared by the applicable bank or other financial institution, to the extent necessary.

### iv. Staff Benefits

51.     In the ordinary course of business, the Debtors implement various benefits plans and policies for their Employees and certain Staff Members that can be divided into the following categories, all as are described in more detail below: (a) medical, health care and prescription benefits, including COBRA coverage (the "**Medical Plans**"), dental care (the "**Dental Plan**"), and vision care (the "**Vision Plan**," and collectively, with the Medical Plans, COBRA, and the Dental Plan, the "**Health Plans**"); (b) employer paid basic life insurance and

17952852.1
233559-10001

short and long term disability insurance (the "**Income Protection Plans**"); and (c) workers compensation insurance (the "**Workers Compensation Program**" and collectively with the Health Plans and the Income Protection Plans, the "**Benefits Plans**"). All obligations with respect to the Benefits Plans are hereinafter referred to as the "**Benefits Obligations**."

### a.    Health Plans

52.    The Debtors believe that it is necessary and appropriate to continue to honor their obligations to Staff Members under the Health Plans. The Debtors request authority, but not direction, to pay all prepetition amounts due under the Health Plans. The Debtors also request authority, but not direction, to continue to offer the Health Plans and honor their obligations thereunder in the ordinary course of business during the administration of these Chapter 11 Cases. As of the Petition Date, the Debtors believe they are current on all premium payments in connection with the Health Plans.

53.    <u>Medical Plan</u>. The Debtors offer their Employees, Managers, and one Independent Contractor health insurance through Blue Cross Blue Shield of Texas ("**BCBS**"). The monthly premium to BCBS is $20,023.00. As of the Petition Date, the Debtors are one month in arrears in payments to BCBS.

54.    <u>Dental Plan and Vision Plan</u>. The Debtors offer their Employees dental insurance (the "**Dental Plan**") and vision insurance (the "**Vision Plan**") administered through Principal Life Insurance Company ("**Principal**"). The monthly premium to Principal on account of the Dental Plan and Vision Plan is $1,170.28.

### b.    Income Protection Plans

55.    The Debtors maintain certain income protection plans including Debtor paid group life, disability and accidental death and dismemberment insurance ("**Income Protection Plans**") through Principal. All Full-time Employees and Managers are enrolled in the Income

17952852.1
233559-10001

Protection Plans. The monthly premium to Principal on account of the Income Protection Plans is $1,170.28. As of the Petition Date, the Debtors believe they are current on all premium payments in connection with the Income Protection Plans.

**c.     Workers' Compensation Program**

56.     The Debtors maintain workers' compensation insurance for their Employees at the statutorily required level for each state in which the Debtors operate. The Debtors maintain workers' compensation coverage ("**Workers' Compensation Insurance**") for claims ("**Workers' Compensation Claims**") through Travelers Casualty and Surety Company. The Debtors pay approximately $8,604.00 a year to maintain the Workers' Compensation Insurance. The Debtors seek authority, but not direction, to pay any premiums under the Workers' Compensation Insurance when they become due.[3]

**v.     Reimbursable Expense Obligations**

57.     Prior to the Petition Date, in the ordinary course of business, the Debtors reimbursed certain Staff Members for reasonable and legitimate expenses incurred on behalf of the Debtors in the scope of the Staff Member's employment ("**Reimbursable Expense Obligations**"). Reimbursable Expense Obligations typically include expenses for, among other things, travel, mileage, food, beverage, cell phone and certain other business and travel related expenses. All such expenses are incurred with the applicable Staff member's understanding that he or she will be reimbursed by the Debtors in accordance with the Debtors' reimbursement policy, as described in more detail below. In all cases, reimbursement is contingent on the Debtors' determination that the charges are for legitimate business expenses.

---

[3]     The Debtors' payments on account of Workers' Compensation Insurance are subject to a premium financing agreement that will be the subject of a separate motion.

17952852.1
233559-10001

58.     The Debtors process expense and reimbursement claims on a rolling basis. As such, it is difficult for the Debtors to determine the exact amount of Reimbursable Expense Obligations outstanding as of the Petition Date because, among other things, Staff Members may have expenses that they have yet to submit to the Debtors for reimbursement. However, on or about the Petition Date, the Debtors estimate that they owe $39,920.00 in Reimbursable Expense Obligations to two Staff Members.

59.     The Reimbursable Expense Obligations are ordinary course expenses that the Debtors' Staff Members incur in performing their job functions. It is essential to the continued operation of the Debtors' business that the Debtors be permitted to continue reimbursing, or making direct payments on behalf of, Staff Members for such expenses.

60.     Staff members incurred the Reimbursable Expense Obligations as business expenses on the Debtors' behalf and with the understanding that they would be reimbursed. To avoid harming Staff Members who incurred the Reimbursable Expense Obligations, the Debtors request authority, but not direction, to satisfy all prepetition Reimbursable Expense Obligations to the extent Employees have paid for such expenses directly from their own funds or are otherwise personally liable for such expenses, but only up to $13,650, less any other payments those Staff Members may receive as a result of the relief requested in this Motion. The Debtors also seek authority to continue their reimbursement policy, and to satisfy any prepetition amounts due in connection therewith, in the ordinary course of business during the administration of these Chapter 11 Cases.

*[remainder of page intentionally blank]*

17952852.1
233559-10001

Dated:  July 16, 2019

By: _____
E. Willard Gary II

17952852.1
233559-10001