UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TEXAS
MIDLAND DIVISION

| | | |
|---|---|---|
| In re: | § § | |
| Remnant Oil Company, LLC and | § | Case No. 19-70106 |
| Remnant Oil Operating, LLC, | § § | Case No. 19-70107 |
| Debtors. | § § | Chapter 11 |
| | § § | (Jointly Administered under Case No. 19-70106) |

**DECLARATION OF E. WILLARD GRAY II IN SUPPORT OF DEBTORS' OBJECTION TO MOTION TO CONVERT CASES TO CHAPTER 7**

I, E. Willard Gray II, declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury as follows:

1. I am the Chief Executive Officer of Remnant Oil Company, LLC ("**Remnant Company**") and the Manager of Remnant Oil Operating, LLC ("**Remnant Operating**" and together with Remnant Company, the "**Debtors**" or "**Remnant**"). On July 16, 2019 (the "**Petition Date**"), each of the above-captioned Debtors filed for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") commencing the cases (the "**Chapter 11 Cases**").

2. I make this Declaration[1] in support of *Debtors' Objection to Motion to Convert Cases to Chapter 7* [Docket No. 253] (the "**Objection**") and in opposition to the *Motion to Convert Cases to Chapter 7* [Docket No. 232] (the "**Motion**") filed by Kodiak Gas Services, LLC ("**Kodiak**"), Baker Hughes Oilfield Operations, LLC and Baker Petrolite, LLC (together, "**Baker**" and with Kodiak, the "**Movants**").

---

[1] Capitalized terms used but not defined in this Declaration have the meaning set forth in the *Declaration of E. Willard Gray II in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 9].

A. **Conversion is Not in the Best Interests of Creditors.**

3. I do not believe that conversion of the Chapter 11 Cases to chapter 7 is in the best interests of creditors.

4. In the current economic environment and with the downturn in the price of oil, the Debtors having been looking for strategic ways to nevertheless stabilize their business and provide a return to creditors. To that end, the Debtors have reached an agreement with Tall City Trucking ("**Tall City**") and Liberty Pump and Supply ("**Liberty**") whereby Tall City and Liberty will provide workover services on 105 of the Debtors' oil wells that are currently shut-in (the "**Workover Proposal**"). The Debtors intend to move for approval of this Workover Proposal in a forthcoming motion to be filed this week. In general, however, the Debtors anticipate that these workover services will be completed within four months of the motion being approved. The production will provide funds to both repay Tall City and Liberty for their services as well as for a return to creditors. The Debtors propose to pay Tall City and Liberty for the services provided on an hourly basis, up to $1.75 million worth of services. The Debtors will be required to make their first payment to Tall City and Liberty beginning no sooner than 90 days after services begin. In exchange for the $1.75 million in services, the Debtors propose to grant a lien on their assets located in the Caprock region of New Mexico. The Debtors' DIP Lender has agreed to subordinate its lien on those assets in favor of Tall City and Liberty so that the Workover Proposal can move forward for the benefit of creditors.

5. The Debtors have also developed a strategy to bring additional funds into the estates until sufficient workovers are completed for funds from production to come into the Debtors' estates. The Debtors have received an offer of $400,000 for a portion of their wind rights under their leases with EDF Renewables, which the Debtors intend to seek approval of via

2

a motion to be filed later this week (the "**Wind Rights Sale**"). The Wind Rights Sale will be subject to higher and better offers. For reference, the Debtors' previous cash offers for the wind rights were $100,000 from York Capital and $478,000 from another entity that required a forty-five day due diligence period to close as well as an exclusive easement from the surface owner that would need to be negotiated, so the Debtors believe, in their business judgment, that the proposed Wind Rights Sale is fair and reasonable even if a higher offer is not obtained. While the Debtors' wind rights are subject to the prior lien of the Debtors' DIP Lender, the DIP Lender has agreed to permit the funds from the sale of the wind rights to nevertheless remain in the Debtors' estates.

6. I believe that the Wind Rights Sale and the Workover Proposal, will, together, pave the way for the Debtors' rehabilitation, which is in the best interests of creditors.

7. Conversely, I believe that conversion would lead to a worse result for creditors than if the cases remained in chapter 11. Conversion would result in a default under the Debtor's DIP financing agreements and the potential loss of much of the Debtors' properties, which are worth substantially more than the outstanding secured debt. Neither the Workover Proposal nor the Wind Rights Sale are possible in chapter 7 as both are dependent on the DIP Lender agreeing to subordinate or release its lien.

8. While the Debtors intend to sue Circle Ridge Production and its principal for the failure to close on the sale of the Debtors' Caprock assets, I understand that a chapter 7 trustee would likely only be able to pursue such claims on a contingency fee basis, resulting in a substantially decreased recovery to creditors from those litigation proceeds.

9. In addition, I understand that any chapter 7 trustee would also need to move to serve as an operating chapter 7 trustee. Since certain of the Debtors' oil and gas leases are

18563832.1
233559-10002

currently held by production, they must be operated or the Debtors could lose their rights under those leases. Also, the Rock Queen Unit, the main unit of the Caprock Assets, is held intact as a result of Remnant's secondary recovery efforts via injection of make-up water. The Debtors' G&A expenses are currently approximately $52,500 and field expenses are approximately $109,000. These expense have already been reduced through reductions in staff levels at both the corporate and field level. An operating chapter 7 trustee would need to conduct operations without funds to do so. Conversely, in chapter 11, the Debtors will be able to pursue the Wind Rights Sale, which will provide a bridge and allow the Debtors' estates to remain viable for several months.

10. I also believe that appointment of a chapter 7 trustee would risk the Debtors' pumpers, who are familiar with the Debtors' properties, seeking employment elsewhere and leaving the chapter 7 trustee unable to adequately and effectively operate the Debtors' assets even if he or she obtained permission to do so.

11. Moreover, I am specifically named on the Debtors' operating license with the New Mexico Oil Conservation Division. A chapter 7 trustee would need to undertake all of the Debtors' responsibilities under that license to maintain the value of the Debtors' assets.

**B.     There is No Cause for Conversion**

12. I understand that the Motion argues that cause for conversion exists because (1) the Debtors allegedly do not have a reasonable likelihood of rehabilitation, (2) the Debtors allegedly have not complied with their reporting requirements, and (3) the Debtors have allegedly been grossly mismanaged. These allegations are untrue.

13. *First*, as set forth above, consummation of the Wind Rights Sale and approval of the Workover Proposal will substantially increase the value of the Debtors' assets and lay the

4

groundwork for the Debtors' rehabilitation. While nothing is certain in the current economic climate and all oil and gas companies are facing challenges, the Debtors are positioning themselves for rehabilitation.

14. *Second*, the Debtors have complied with their reporting requirements. As the Debtors previously advised the U.S. Trustee, as of the Petition Date, the Debtors were behind in finalizing their financial statements for the first and second quarters of 2019. Therefore, although the Debtors timely paid their quarterly U.S. Trustee fees utilizing the log they maintained of their income and disbursements and the budgets they prepared in connection with their motions to obtain financing, they lacked sufficient information to complete MOR2 and MOR3. Both MOR2 and MOR3 require balance sheet information regarding the Debtors as of the Petition Date. Once the Debtors were able to complete their financial statements for the first and second quarters of 2019, they were able to complete and finalize the outstanding monthly operating reports. After the initial delay, the Debtors have timely filed each monthly operating report.

15. *Third*, I do not believe that the Debtors have been grossly mismanaged as alleged by Movants. Instead, management has worked tirelessly to consummate value-maximizing transactions for the benefit of creditors, including, without limitation, the marketing efforts undertaken with Seaport Global Securities and Energy Advisors Group, seeking out a deal with Liberty and Tall City even in the challenging economic circumstances, obtaining a proposed purchaser for the sale of the Debtors' wind rights, and attempting to close the sale with Circle Ridge Production. Moreover, after the Motion was filed, prompting the Debtors' original DIP Lender to refuse to extend the maturity date of the DIP Facility, a member of the Debtors' management stepped in, through his limited liability company, to purchase the DIP Facility and

18563832.1
233559-10002

ensure the original DIP Lender would not foreclose on a substantial portion of the Debtors' assets. And management has undertaken all of these efforts without receiving any compensation whatsoever from the Debtors since October 2019. I believe that these efforts show a commitment on the part of the Debtors' management to fulfill their fiduciary duties to creditors.

16. I understand that Movants have argued that the Debtors' management has irreconcilable conflicts, citing management's desire to seek repayment of the more than $8 million that they loaned to the Debtors prior to the Petition Date and that Movants believe management has a desire to "ignore obvious avoidance actions" resulting from payments to the Debtors' principals in the year prior to the Petition Date. *See* Motion at ¶ 21. However, I believe that management's loans of more than $8 million to the Debtors aligns management with creditors in seeking to obtain the best outcome for the Chapter 11 Cases rather than showing a conflict exists. Moreover, at management's direction, the Debtors have already agreed with the Committee and represented to the Court that the Debtors' plan will provide for the Committee or its designee to evaluate and pursue avoidance actions against the Debtors' principals to the extent colorable claims actually exist. I believe this commitment further demonstrates management's adherence to their fiduciary duties and certainly does not support a finding that the Debtors' have been grossly mismanaged since the Petition Date.

Dated: April 8, 2020

By:_____
E. Willard Gary II

18563832.1
233559-10002